# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| VALDA THOMAS ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 07 C 4393 |
| v. ) | |
| ) | Magistrate Judge Nan R. Nolan |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Valda Thomas claims that she is disabled due to vision problems and colitis. She filed this action seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 416, 423(d). The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and have now filed cross-motions for summary judgment. For the reasons set forth here, the Commissioner's motion is granted and Ms. Thomas' motion is denied.

## PROCEDURAL HISTORY

Ms. Thomas applied for DIB on February 2, 2004, claiming that she became disabled on June 1, 2003 due to iritis,[1] colitis and high blood pressure. (R. 91-93, 309, 312, 325.) The application was denied initially on May 5, 2004, and again on reconsideration on April 19, 2005. (R. 49, 50-55, 60-63.) Ms. Thomas appealed the decision and requested an administrative hearing, which was held on May 1, 2006. (R. 295.) On August 7, 2006, the Administrative Law Judge ("ALJ") denied Ms. Thomas' claim for benefits, finding that she is capable of performing a significant number of payroll clerk jobs available in the national economy. (R. 38-39.) The ALJ found that Ms.

---

[1] "Iritis" is inflammation of the iris, or the colored part of the eye. Symptoms include pain, redness, sensitivity to light and blurred vision. (*See* http://www.webmd.com/eye-health/iritis.)

Thomas' iritis and loss of peripheral visual field are severe impairments, but that she retains the residual functional capacity to perform activities requiring fine visual acuity up to 85% of the workday, and to maintain concentration, persistence and pace for 90% of the workday. (R. 38.) As for Ms. Thomas' hypertension and colitis, the ALJ found that these severe impairments are well-controlled with medication and regular examinations. (R. 36.) Ms. Thomas now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

## FACTUAL BACKGROUND

Ms. Thomas was born on November 6, 1943 and was 62 years old at the time of the hearing before the ALJ. (R. 100, 261.) She has a high school education and attended college for a year and a half. (R. 301.) Ms. Thomas worked for AT&T for 33 years. From April 1988 through May 1996, she worked as a repair clerk, which required her to read computer screens, communicate with customers, perform data entry, dispatch technicians, and compile information. (R. 110.) In June 1996, Ms. Thomas was promoted to supervisor. In this position, she continued to read computer screens, but also supervised 12 other technicians and reported on their productivity. (R. 111.) Ms. Thomas retired from her job in June 2003. (R. 361.)

**A.     Medical History**

Ms. Thomas began seeing ophthalmologist Robert G. Taub, M.D. in the fall of 2002 when her right eye started "acting up." (R. 174.) Dr. Taub diagnosed recurrent iritis and prescribed Zatidor drops to relieve the itching. (*Id.*) Ms. Thomas continued to see Dr. Taub at least once per month but experienced increasing pain in her right eye. On January 27, 2003, Dr. Taub performed outpatient surgery to remove an open angle glaucoma in Ms. Thomas' right eye. (R. 144.) Over the next year, Ms. Thomas had regular appointments with Dr. Taub, but his records of those visits are illegible. (R. 159-67.)

On January 6, 2004, Dr. Taub performed a visual field test on Ms. Thomas using a so-called Humphrey machine. This involves a patient placing her head in a machine and pressing a button

2

when she sees dots on a screen. (R. 332, 341, 348.) The test indicated that Ms. Thomas' results were "outside normal limits" and reflected "low patient reliability." (R. 149-50.) Again, Dr. Taub continued to treat Ms. Thomas over the next 20 months, but his notes are largely illegible. (R. 151-58, 251-56.)

On January 5, 2005, Norma Villanueva, M.D. performed a general consultative examination of Ms. Thomas. (R. 228-31.) Dr. Villanueva observed that Ms. Thomas' eyes were "equal and reactive to light and accommodation"; that "[e]xtraocular movement was intact"; and that a "[f]undoscopy failed to reveal any AV nicking, arteriolar narrowing, hemorrhages or exudates." (R. 229.) Dr. Villanueva conducted a Snellen's visual acuity test, and found that Ms. Thomas' vision, without correction, was 20/100 in the right eye and 20/50 in the left eye. With correction, Ms. Thomas' vision was 20/70 in both eyes, and 20/50 in both eyes with pinhole correction. (*Id.*)

A couple of months later on March 22, 2005, ophthalmologist David Hillman, M.D. performed a second consultative exam focusing exclusively on Ms. Thomas' eyes and vision. (R. 232.) Ms. Thomas told Dr. Hillman that her "visual field is gone," but also acknowledged that she "does drive." Dr. Hillman noted Ms. Thomas' history of iritis but found it inactive at the time of the examination. He also observed that Ms. Thomas' pupils were "minimally reactive"; "[m]otility was full and straight"; there was "no nystagmus" (involuntary movement); and there was no "afferent pupillary defect." (*Id.*) Dr. Hillman found that Ms. Thomas had clear corneas, as well as normal irises, disc, macula and periphery. A visual acuity test revealed that Ms. Thomas had 20/40 vision in her left eye with and without correction, and in her right eye, she had 20/70 vision without correction and 20/40 vision with correction. (*Id.*) Dr. Hillman also performed a visual field test using the Goldman, or manual, method. (R. 232, 238.) The test indicated that Ms. Thomas' visual field efficiency was 56.6% in her left eye and 66.2% in her right eye. Her central visual efficiency was 85%, reflecting 20/40 vision in both eyes. (R. 235.) Overall, Ms. Thomas' total visual efficiency was 48.11% in her left eye, and 56.27% in her right eye. (*Id.*)

3

On August 17, 2005, Dr. Taub wrote a letter stating that Ms. Thomas had a cataract in her left eye that was stable; recurring iritis; and "a non congruous bitemporal hemianopsia" that rendered her "unable to perform any tasks that require vision." (R. 199.) "Bitemporal hemianopsia" is loss of vision in the outer half of both the right and left visual fields. *See* THE MERCK MANUAL, 18th ed., at 872. It is usually caused by strokes, tumors or trauma. (*See* http://hemianopiasociety.com.) Dr. Taub continued to treat Ms. Thomas through April 2006; again, his notes are largely illegible. (R. 239-50, 258.) It appears that Ms. Thomas complained of "floaters" in her field of vision on April 5, 2006. She also told Dr. Taub on April 25, 2006 that her left eye was "worse" and that her right eye was "sore." (R. 258.)

After the May 1, 2006 hearing, Dr. Taub conducted a second visual field test on Ms. Thomas in response to the ALJ's request for clarification. The May 2, 2006 Humphrey machine test showed results similar to those produced during the January 6, 2004 test, and again were "outside normal limits." (R. 141-42.) On May 4, 2006, Dr. Taub submitted a letter stating, without explanation: "Ms. Valda Thomas has a Bitemporal Hemianopsia. This field defect makes it impossible for her to perform any type of work and meets the requirement for complete disability." (R. 140.)

**B.    Ms. Thomas' Testimony**

At the hearing before the ALJ, Ms. Thomas testified that her vision impairment requires her to turn her head in order to see things on her left or right. (R. 316.) She can read two pages at a time but then has to stop because her eyes and head hurt. (R. 309-10, 317.) As a result, she has discontinued all magazine subscriptions and only listens to audio books. She does not watch television but claimed that doing so would hurt her eyes just like looking at a computer screen. In that regard, Ms. Thomas testified that she had trouble in her last job because she had to work at a computer for approximately 4.5 hours each day, and her eyes would get red, and she experienced blurred vision and severe headaches. (R. 305.)

Ms. Thomas stated that she stopped driving when she retired from her job in June 2003, and she does not take public transportation by herself because she has "problems looking down." (R. 311.) She is afraid to go outside alone for fear of falling, though she has never actually fallen, and she has friends, family and neighbors help her with the shopping, cooking and laundry. (R. 315, 319-20.) Ms. Thomas testified that she has been wearing dark glasses year around since 1996 because the light hurts her eyes. (R. 319.) In addition, she started seeing "floaters" in her eyes two months prior to the hearing. (R. 313.) Ms. Thomas stated that she uses prescription eye drops twice a day, which helps reduce inflammation and discomfort. (*Id.*)

C. **Medical Expert Testimony**

Elise Torczynski, M.D., a board certified ophthalmologist, testified at the hearing as a medical expert. Dr. Torczynski testified that Ms. Thomas' medical records reflect that without correction, her worst vision in either eye is 20/80, and with correction, she ranges from 20/40 to 20/20 vision. (R. 326.) Dr. Torczynski disputed the accuracy of Dr. Taub's January 2004 visual field test, noting that (1) the loss of vision reflected in the test was "totally incompatible with [Ms. Thomas'] visual acuity or her activities"; and (2) the test itself indicated "low patient reliability" and produced results that were "outside normal limits." As for the diagnosis of "non congruous bitemporal hemianopsia," Dr. Torczynski first noted that the visual field test results actually reflected "a non congruous hemianopsia temporally" with a "total loss of vision on the nasal field" of the right eye. More significantly, Dr. Torczynski observed that bitemporal hemianopsia is often caused by strokes or tumors; the fact that Dr. Taub never sent Ms. Thomas for an MRI or CT scan suggested to Dr. Torczynski that even he did not believe the diagnosis. (R. 326, 331-34, 337-40.)

By contrast, Dr. Torczynski observed that Dr. Hillman's March 2005 visual field exam showed that Ms. Thomas has additional vision that was not recorded on Dr. Taub's exam. Dr. Torczynski found Dr. Hillman's test more credible because it was more consistent with Ms. Thomas' actual complaints. Specifically, Dr. Hillman's test revealed that Ms. Thomas has vision loss of

5

approximately 50% in each eye, but only on the far outside periphery. (R. 340-41, 343.) Dr. Torczynski noted that Ms. Thomas has "good vision down below" and could pass the eye test to drive a car. (R. 350, 352.) According to Dr. Torczynski, nothing in the medical record supported or explained Ms. Thomas' testimony that she can only read for a few minutes without developing a headache. Dr. Torczynski acknowledged that Ms. Thomas has iritis, but noted that this condition would not produce the stated symptoms. Dr. Torczynski also observed that "floaters" are "not at all unusual" in a person of Ms. Thomas' age, and that "they gradually go away . . . or we just get used to them." (R. 328.)

Hugh Savage also offered medical expert testimony regarding Ms. Thomas' colitis and hypertension. Dr. Savage opined that both conditions are fairly well-controlled with a simple medication regimen, and that neither would affect her ability to work. (R. 359.)

**D.     Vocational Expert Testimony**

Michelle Peters testified at the hearing as a vocational expert ("VE"). She had an opportunity to review Ms. Thomas' record, and she was present throughout the hearing. (R. 298-99, 362.) The VE stated that Ms. Thomas had past experience with data entry, computer work and payroll, skills that all would transfer to payroll clerking jobs. (R. 364.) The VE concluded that if Ms. Thomas could only look at a computer monitor for 50% of her workday, then she could not perform her past work as a technician supervisor. (R. 364-65.) A person capable of engaging in fine visual acuity for 85% of the workday, however, could perform payroll clerking jobs at the light or sedentary level that would not require exposure to dangerous machinery or work conditions. According to the VE, there are 4,000 such positions available in the Chicago metropolitan area. (R. 367.)

**E.     ALJ Decision**

In a lengthy and detailed decision, the ALJ found that Ms. Thomas' iritis, loss of peripheral visual field, hypertension and irritable bowel syndrome are severe impairments, but that they do not meet or equal one of the impairments listed in the Social Security Regulations. (R. 28-39.) The ALJ determined that Ms. Thomas has the residual functional capacity ("RFC") to work at all exertional levels performing activities requiring fine visual acuity up to 85% of the workday, at a 90% rate of concentration, persistence and pace. In reaching this conclusion, the ALJ credited Dr. Torczynski's testimony, including that Dr. Taub's visual field assessment was not persuasive given the "low patient reliability" and the failure to follow-up with an MRI or CT scan. (R. 32.) The ALJ found it significant that Dr. Taub was given an opportunity after the hearing to clarify his findings, but merely repeated them without explanation. (R. 32, 35.)

The ALJ agreed that Ms. Thomas must work in an environment free from exposure to dangerous machinery, and that she cannot work at unprotected heights or climb ladders, ropes, or scaffolds. Based on all of her restrictions, the ALJ found Ms. Thomas capable of performing a significant number of payroll clerk jobs (4,000 in the Chicago metropolitan area).

## DISCUSSION

**A.     Standard of Review**

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court may not engage in its own analysis of whether Ms. Thomas is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* (citation omitted). The court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)). Evidence is considered substantial "if a reasonable person would

accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004).

Although this court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (internal citations omitted). The court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

**B.      Five-Step Inquiry**

To recover DIB under Title II of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if she is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. § 416.905. In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

**C.     Analysis**

Ms. Thomas raises three main arguments in support of her request for a reversal and remand: (1) the ALJ erred in evaluating the opinions of the treating and non-examining physicians; (2) the ALJ erred in finding that Ms. Thomas has transferable skills; and (3) the ALJ failed to properly evaluate Ms. Thomas' credibility.  None of these arguments warrants reversal or remand.

**1.     ALJ's Evaluation of Treating Ophthalmologist's Opinion**

Ms. Thomas first argues that the ALJ erred in failing to give controlling weight to her treating ophthalmologist's opinion that she is disabled.  A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with other substantial evidence." *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006).  A claimant is not disabled simply because her treating physician says so. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001).  "The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." *Id.* (*quoting Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985)).  If a treating physician's opinion is not entitled to controlling weight, the ALJ considers several factors in determining the weight to give the opinion, including:  the length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, the degree to which the opinion is supported by medical signs and laboratory findings, the consistency of the opinion with the record as a whole, and whether the opinion was from a specialist.  20 C.F.R. § 404.1527(d)(2)-(5).

The ALJ's conclusions that Dr. Taub's opinion was not entitled to controlling weight, and that the medical expert's testimony was more credible, are supported by substantial evidence.  Dr. Torczynski testified that all of the medical records reflect that without correction, Ms. Thomas' worst vision in either eye is 20/80.  With correction, meaning with her glasses, "she ranges from 20/40 to 20/20 in one or both eyes on every visit I could find."  (R. 326).  With respect to visual field, Dr.

Torczynski noted that Ms. Thomas has a "fairly symmetric loss"; "good vision down below"; and "a little bit more to the left [] she loses visual field. But it's not terribly significant." (R. 350.) Dr. Torczynski explained that Dr. Taub's contrary finding from January 2004 was unreliable because it "shows a significant decline in half of the left eye and pretty much all of the right eye, and such that it's totally incompatible with [Ms. Thomas'] visual acuity or activities." (R. 326). That is, if the visual field exam performed by Dr. Taub were accurate, Ms. Thomas' complaints "would be significantly more compelling than they are today." (R. 337.)

Dr. Torczynski also opined that Dr. Taub's finding of non congruous bitemporal hemianopsia is "not exactly correct" and "makes no sense." (R. 331; 337). Rather, "he should say that there's a non-congruous hemianopsia temporally, but on the right eye, there's a total loss of vision on the nasal field." (R. 331). Significantly, both diagrams of the January 2004 test stated there was "low patient reliability" and indicated the results were "outside normal limits." (R. 333.) Moreover, Dr. Torczynski observed that in the normal course of practice, if a patient had a visual field exam similar to Ms. Thomas' January 2004 test, "you would probably send them almost immediately for either an MRI or a CT scan of their brain and orbits" to see if it was a stroke or a tumor in the brain or bilateral tumors in the optic nerves or in the optic chiasm. (R. 339-40.) Dr. Torczynski testified that Dr. Taub "could not have been very worried" about the visual field taken in January 2004 because "he never repeats the visual field, and he makes no comment about it except in this note a year and a half later" (in August 2005). (R. 327).

In accepting Dr. Torczynski's opinion, the ALJ observed that medical reference manuals confirm her testimony that hemianopsia is most often caused by strokes, tumors or head trauma. Because the record contains no evidence of head injury, the ALJ agreed that the likely causes of hemianopsia in Ms. Thomas' case would be brain tumor or cardiovascular accident. (R. 35.) Yet Dr. Taub never recommended medical imaging of Ms. Thomas' brain or neurological investigation. (*Id.*) The ALJ reasonably concluded that Dr. Taub must have actually believed that the January

10

2004 test had low patient reliability, and that the results were outside normal limits. (*Id.*) As the ALJ explained, Dr. Taub's test showed "a significant decline [of visual field] in half of the left eye and pretty much all of the right eye." (R. 31.) The ALJ observed that such test results "would cause [Ms. Thomas] to produce even more complaints concerning her vision w[ere] they true and accurate." (R. 36.)

The ALJ also acted reasonably in accepting Dr. Torczynski's opinion that the visual exam performed by Dr. Hillman on March 22, 2005 was more reliable than Dr. Taub's. The ALJ first noted that Ms. Thomas' counsel admitted that the Social Security Regulations prefer hands-on testing as performed by Dr. Hillman over machine produced reports like those generated by Dr. Taub. (R. 36; 344; 348.) Using the more reliable hands-on test, Dr. Hillman observed that there was some diminution in Ms. Thomas' right eye to 66 percent and in her left eye to 56 percent, but that Ms. Thomas has additional vision that is not recorded on the field test performed by Dr. Taub. (R. 334.) The ALJ noted Dr. Torczynski's observation that, based on Dr. Hillman's test results, Ms. Thomas has loss of visual field on the "far out periphery," which is "not a major half." (R. 32, 342.) In addition, Ms. Thomas' central visual efficiency was 85%, and her visual acuity, without correction, was 20/70 in the right eye and 20/40 in the left eye, and with correction she was 20/40 in both eyes. (R. 232; 235, 326). Ms. Thomas' iritis was not active, the examination of her fundus and posterior bulb was unremarkable, and her eye pressures were okay. (*Id.*)

The ALJ asked Dr. Torczynski if there was any objective basis in the record for Ms. Thomas' claim that after five minutes of reading or looking at a computer monitor or television screen, she develops headaches. (R. 328). Dr. Torczynski responded: "No, there's nothing in the record that indicates why she should have this, and especially this is not a thing that usually comes with chronic iritis." (*Id.*) Dr. Torczynski opined that with her glasses, Ms. Thomas should not be precluded from performing any visual activity. (R. 329). Ms. Thomas' visual acuity is a "little bit

diminished," but she should be able to drive, and there is no "objective evidence in the record that explains her problems." (*Id.*)

Ms. Thomas argues that it was improper for the ALJ to reject Dr. Taub's opinion because his diagnosis "benefitted from years of regular and frequent treatment with the plaintiff." This, however, is only one factor to consider, along with whether the opinion is supported by medical evidence and consistent with the record as a whole. 20 C.F.R. § 404.1527(d)(3), (4). Significantly, in part because Dr. Taub's treatment notes were largely illegible, the ALJ gave Dr. Taub a post-hearing opportunity to repeat the visual field exam and explain the basis for his August 2005 letter stating that Ms. Thomas has a bitemporal hemianopsia and is totally disabled. (R. 324, 353-54.) The doctor, however, failed to do so. (R. 35). As the ALJ explained:

> It is more than telling that although the claimant is given the opportunity to obtain from Dr. Taub post hearing an explanation of his cryptic letter, that Dr. Taub merely performs or orders the same type of visual field test and again cryptically states in the letter of May 4, 2006 that the claimant has bitemporal hemianopsia and that the field defect makes it impossible for her to perform any type of work and meets the requirements for complete disability. Although the machine driven report this time does not state that the test showed poor patient reliability, the report again states that the test is outside normal limits, and Dr Taub does not comment on the fact that the test is outside normal limits where [Dr.] Torczynski explained that the report of outside normal limits also reflects poorly on the reliability of the test. Also, like the former machine driven visual field report, there is deviation shown from the fixation point, another important factor going to the reliability of the test; yet Dr. Taub does not comment upon it. He provides no explanation, although given ample opportunity to do so.

(R. 35-36). *Cf.* 20 C.F.R. § 404.1527(d)(3) ("The better an explanation a source provides for an opinion, the more weight we will give that opinion.")

The ALJ's conclusion that Dr. Taub's opinion is not supported by medical signs and laboratory findings, and is inconsistent with the record as a whole, is adequately explained and supported by substantial evidence. *See Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004)) ("An ALJ may . . . discount a treating physician's medical opinion if it . . . 'is inconsistent with the opinion of a consulting physician

12

or when the treating physician's opinion is internally inconsistent.'") Ms. Thomas' motion for summary judgment on this basis is denied.

### 2. Ms. Thomas' Skills

Ms. Thomas next objects to the ALJ's finding that she has transferable skills from her previous employment that render her capable of performing the job of payroll clerk. In Ms. Thomas' view, the payroll clerk position requires her to read and work at a computer for more than half the day, which she cannot do. According to the Regulations, transferable skills are those that can be used to meet the requirements of other jobs. 20 C.F.R. § 404.1568(d) (skills are transferable "when the skilled or semi-skilled work activities you did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work.") Here, the ALJ relied on the VE's testimony that Ms. Thomas' transferable skills include data entry, computer work and payroll. (R. 37-38.) The VE did agree that a person with Ms. Thomas' skills who can only do computer work for 50% of the workday would not be capable of performing any available jobs. (R. 364-65.) The VE also stated, however, that a person with Ms. Thomas' transferable skills who can perform fine vision tasks for 85% of the workday would be capable of working as a payroll clerk. (R. 367.) *See David v. Barnhart*, 446 F. Supp. 2d 860, 878 (N.D. Ill. 2006) (ALJ properly relied on VE's testimony where the VE had the opportunity to review the record and was present throughout the hearing). Based on all of the evidence in the record, including the medical evidence discussed above, the ALJ found that Ms. Thomas can perform fine vision tasks for 85% of her workday. (R. 36, 37.) The ALJ's conclusion regarding Ms. Thomas' transferable skills is therefore supported by substantial evidence.

### 3. Ms. Thomas' Credibility

Ms. Thomas finally argues that the ALJ erred in disregarding all of her testimony at the hearing. As a preliminary matter, the ALJ did not reject all of her testimony; rather, he stated: "[g]iving [Ms. Thomas] the benefit of the doubt concerning headaches but keeping in mind her low

level of credibility, the claimant may have at best a 10% reduction in ability to maintain concentration, persistence and pace . . . ." (R. 36.)

The ALJ went on to explain his reasons for finding that Ms. Thomas' testimony was not very credible. In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence. *See* SSR 96-7p, at 2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Id.* (quoting *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004)). *See also* 20 C.F.R. § 404.1529. The ALJ must provide specific reasons for the credibility finding, but hearing officers are in the best position to evaluate a witness's credibility and their assessment will be reversed only if "patently wrong." *Schmidt*, 496 F.3d at 843; *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

The ALJ noted a variety of medical evidence that contradicted or failed to support Ms. Thomas' testimony. For example, Dr. Torczynski testified that there was no objective support for Ms. Thomas' claim that she gets headaches when viewing a television screen or computer monitor for more than five minutes. The ALJ credited Dr. Torczynski's opinion that "[t]his was not the kind of development that usually arose from chronic iritis." (R. 31.) The ALJ also credited Dr. Torczynski's testimony that there was no objective medical reason why Ms. Thomas cannot pass a driving vision test enabling her to drive a car, or read for four or five hours a day as long as she wears her bifocals. (R. 33.) In addition, the ALJ observed that the January 2004 visual field test reflected "low patient reliability" on Ms. Thomas' part, and both the January 2004 and May 2006 tests were "outside normal limits." (R. 32, 35.) The ALJ noted, "Dr. Torczynski very carefully explained that [Ms. Thomas] was not complying with the fixation points in either the left or the right eye during the examination." (R. 32.)

Ms. Thomas objects that the ALJ should have considered her 30-year work history, which "would have entitled plaintiff to substantial credibility." In fact, the ALJ expressly acknowledged this work history, but found that it was insufficient to overcome other evidence in the record:

> Despite the fact that [Ms. Thomas] has a very good work history, [her] testimony regarding her ability to see merits very little credibility because the visual field tests reflect low patient reliability and outside normal limits. More than that, the test reports produced would cause the claimant to produce even more complaint concerning her vision w[ere] they true and accurate.

(R. 36.) The ALJ extensively reviewed the entire case record and was not patently wrong in finding that Ms. Thomas' testimony was not credible.

## **CONCLUSION**

For the reasons stated above, Defendant's Motion for Summary Judgment [Doc. 24] is granted, and Plaintiff's Motion for Summary Judgment [Doc. 18] is denied. The Clerk is directed to enter judgment in favor of the Commissioner.

ENTER:

Dated: May 12, 2008

_____
NAN R. NOLAN
United States Magistrate Judge